SOUTHERN COMPANY ENERGY
MARKETING, L.P., Plaintiff,

v.

VIRGINIA ELECTRIC AND POWER
COMPANY, Defendant.

No. Civ.A. 99–1221–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 19, 1999.

Ronald James Wiltsie, Hogan & Hartson, L.L.P., Washington, D.C., for plaintiff.

Timothy Stephen Baird, Mays & Valentine, Richmond, VA, for defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

In this diversity breach of contract action, defendant claims that because an absent third party is in bankruptcy and cannot be joined, at least one of the claims in issue must be dismissed pursuant to Rules 19(b) and 12(b)(7), Fed.R.Civ.P. For the reasons that follow, dismissal is unwarranted because the absent third party is not "necessary" within the meaning of Rule 19(a).

## I

Plaintiff Southern Company Energy Marketing, L.P., ("Southern"), defendant Virginia Electric and Power Company ("VEPCO"), and nonparty Power Company of America ("PCA"), each participate in the wholesale power market as buyers and sellers of electric power. This case is a breach of contract action that directly involves three agreements between VEPCO and Southern, but that implicates at least two other agreements involving PCA. The contracts relevant to this case are as follows:

(1) In May 1997, Southern acquired an option to purchase 100MW of power from VEPCO at $30/MWh for sixteen continuous hours each business day of July 1998, to be delivered at the TVA transmission system (hereinafter the "TVA Agreement").

(2)(3) In August 1997 and February 1998, VEPCO agreed to purchase a total of 100MW of electric power from Southern for sixteen continuous hours each business day of July and August 1998, to be delivered at the Entergy transmission system (hereinafter the "Entergy Agreements").[1]

(4) In February 1998, VEPCO agreed to sell 100 MW of power to PCA at the Entergy transmission system during peak hours each business day of July and August 1998 ("VEPCO–PCA Entergy Agreement").

(5) Prior to June 1998, Southern agreed to buy 100 MW of power from PCA, to be delivered at the Entergy transmission system, for sixteen continuous hours each business day of July and August

---

1. The first agreement, entered into in August 1997, obligated VEPCO to purchase 50MW at $34.25/MWh during the relevant hours, and the second agreement, entered into in February 1998, obligated VEPCO to buy an additional 50MW at $48.00/Mwh during the relevant hours.

1998 (hereinafter the "PCA–Southern Entergy Agreement").

Agreements (2)–(5) and the resulting interrelationships are illustrated by Figure 1.

## Figure 1: The PCA, Southern, and VEPCO Entergy Agreements

VEPCO

SOUTHERN PCA

⇦ Power
⇨ Payment

In this action, Southern sues VEPCO for breach of the TVA Agreement and the Entergy Agreements. But what might otherwise be a straightforward breach of contract action is complicated by a curious practice within the wholesale power market: the use of "book-outs" to save the costs associated with the actual delivery of the power. A book-out occurs when parties to an agreement to sell electric power agree to waive the delivery obligation, while keeping all other obligations in place. A party who is both a buyer and a seller of electric power at a particular time and place can save the transaction costs associated with delivering the power if it can establish a link between the entity to which it is selling power and the entity from which it is buying power. An illustration serves to clarify this practice. Assume that A has contracted to sell 100MW of power to B, and A has also contracted to buy 100MW of power from C. Then assume that B has also contracted to sell 100MW of power to C. For the parties to perform, each would be required to deliver 100 MW of power. Specifically, A would deliver 100 MW to B, B would deliver 100 MW to C, and C would deliver 100MW to A. At the end of these transactions, each party would thus have 100MW of power, the amount with which they started. Thus, if the parties simply eliminated delivery, and maintained the payment and other contractual obligations, they would each realize the benefits of their respective bargains while avoiding delivery costs.

In early summer 1998, as a result of the Entergy Agreements and the PCA–Southern Entergy Agreement, Southern was both a buyer and a seller of power in July at Entergy. Accordingly, Southern conferred with VEPCO and PCA to identify a chain allowing it to book-out the July Entergy transactions.

As Figure 1 illustrates, such a chain existed, because VEPCO and PCA were themselves linked by VEPCO's obligation to sell power to PCA at Entergy in July. Recognizing that the three parties were so linked, they each agreed to book-out the July portion of the transactions.

PCA, however, turned out to be the weak link in this chain. In the summer of 1998, VEPCO became concerned that PCA could not meet its obligations, because PCA had defaulted on a number of other unrelated delivery obligations to VEPCO and other participants in the wholesale power market. Accordingly, VEPCO determined that it had reasonable grounds for insecurity as to all VEPCO–PCA deals, including the VEPCO–PCA Entergy Agreement. Thus, on July 7, 1998, VEPCO demanded that PCA provide adequate assurance of performance, and suspended performance of any of its obligations to PCA pending receipt of assurance. No such assurance was forthcoming. Indeed, PCA's troubles deepened, and in August it entered involuntary bankruptcy proceedings in the United States Bankruptcy Court for the District of Connecticut, in which court it was ultimately adjudicated to be bankrupt.

On the same day that VEPCO demanded assurance from PCA, VEPCO also asked Southern to undo the book-out of the Entergy Agreements, demanded that Southern deliver the power that was the subject of the agreements, and suspended payment on those agreements pending delivery. When Southern refused to undo the book-out, VEPCO allegedly retaliated by refusing to meet its delivery obligations under the TVA Agreement. Southern thus seeks damages from VEPCO for breach of contract for both the Entergy Agreements and the TVA Agreement, as well as a declaration of its rights under the three agreements. VEPCO defends, arguing that the book-out was terminated, and that Southern was itself in breach for failing to deliver the power. And, in the dismissal motion at bar, VEPCO argues that the Entergy claims must be dismissed because (i) joinder of PCA is necessary for proper litigation of those claims, but (ii) that this joinder cannot be accomplished

given the automatic stay[2] in place owing to the bankruptcy proceeding. The question presented is thus whether Southern's Entergy claims must be dismissed on the ground that PCA is an indispensable party to those claims.

## II

■ Whether a party is indispensable requires a two-step inquiry. *See* Rule 19, Fed. R.Civ.P.; *Owens–Illinois Inc. v. Meade,* 186 F.3d 435, 440 (4th Cir.1999). First, it must be determined whether a party is "necessary" pursuant to Rule 19(a). *See Owens–Illinois,* 186 F.3d at 440. And second, if a necessary party is unavailable for some reason (in this case because of the bankruptcy stay), it must be determined whether the party is "indispensable" to the case, in that the party's appearance is so essential that the case must be dismissed. *Id.* Analysis of necessity and indispensability under Rule 19 is not a mechanistic process, however, and "the court must consider the practical potential for prejudice in the context of the particular factual setting presented by the case at bar." *Schlumberger Indus. Inc., v. National Surety Corp.,* 36 F.3d 1274, 1286 (4th Cir. 1994).

■ Analysis of the question presented thus begins with the question whether PCA is a necessary party. *See* Rule 19(a). A party is not necessary simply because joinder would be convenient, or because two claims share common facts, for that would render the distinction between permissive joinder under Rule 20, Fed.R.Civ.P., and joinder under Rule 19 "practically meaningless." *Field v. Volkswagenwerk AG,* 626 F.2d 293, 301 (3d Cir.1980). A party is necessary under Rule 19(a) only if the party's presence is needed to afford "complete relief to those *already parties,*" Rule 19(a)(1) (emphasis added), or if the nonparty "claims an interest" in the "subject of the action" and a failure to join that party would either "impair or impede the [nonparty's] ability to protect that interest," Rule 19(a)(2)(i), or would "leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or

---

**2.** *See* 11 U.S.C. § 362(a).

otherwise inconsistent obligations," Rule 19(a)(2)(ii).

In this case, Rule 19(a)(1) is inapplicable because complete relief will be afforded among those already parties. Specifically, the damages and rights at issue relate exclusively to the relationship between Southern and VEPCO; Southern does not seek relief from a nonparty in this action, nor would PCA's claims against VEPCO affect Southern's claims against VEPCO. Rule 19(a)(2)(i) is inapplicable, because this action will not prejudice any claim PCA might have with respect to the Entergy transaction. PCA is not a party and therefore not subject to collateral estoppel or res judicata as to this litigation. *See Blonder–Tongue Lab. Inc., v. University of Ill. Found.*, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Thus, PCA is necessary only if its interests "may ... leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Rule 19(a)(2)(ii).

VEPCO claims that PCA's absence creates the possibility that VEPCO will face "inconsistent obligations," and thus analysis proceeds to consideration of that phrase. The term "inconsistent obligations" does not mean "any inconsistency," and in that regard other circuits have recognized a distinction between inconsistent obligations and inconsistent adjudications.[3] Inconsistent obligations arise only when a party to the case risks facing conflicting judgments, so that compliance with one would conflict with the other.[4] Inconsistent adjudications, on the other hand, are those in which a party might prevail on one theory of liability in one case, and then fail on that same theory, and even on the same or similar facts, in another case against another party; while inconsistent as a matter of logic, these judgments would not necessarily subject the party to inconsistent legal obligations.[5]

3. *See Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1, 3 (1st Cir.1998) ("[I]nconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident."); *Field*, 626 F.2d at 301–02 (holding that potentially inconsistent tort judgments in two separate suits arising from the same set of facts did not render a plaintiff in one case a necessary party to the other case).

4. *See Teamsters Local Union No. 171 v. Keal Driveaway Co.*, 173 F.3d 915, 918–19 (4th Cir. 1999) (determining that a nonparty union, who was the beneficiary of an agreement between the company defendant and that union, was a necessary party in a suit brought by another union challenging the validity of that agreement); *Mann v. City of Albany*, 883 F.2d 999, 1002 (11th Cir.1989) (declaring that the class of plaintiffs protected by an anti-discrimination injunction regarding the city's hiring practices were necessary parties to a case in which another plaintiff's case challenged the legality of city policies enacted in response to that decree); *Window Glass Cutters League of America v. American St. Gobain Corp.*, 428 F.2d 353, 354–55 (3d Cir.1970) (holding that a nonparty union was a necessary party, when there was a "substantial risk" that the absent party would bring a grievance against the defendant company on the same subject matter as the dispute between plaintiff and defendant, "leading potentially to conflicting awards").

5. *See Delgado*, 139 F.3d at 3 ("[T]he mere possibility of inconsistent results in separate actions does not make the plaintiff in each action a necessary party to the other."); *Field*, 626 F.2d at 301–02 ("Nor ... does the possibility of a subsequent adjudication that may result in a judgment that is inconsistent as a matter of logic ... trigger the application of Rule 19."); *RPR & Associates*, 921 F.Supp. 1457, 1464 (M.D.N.C. 1995) ("Rule 19 is not triggered by the possibility of a subsequent adjudication that is inconsistent as a matter of logic."); *Bedel v. Thompson*, 103 F.R.D. 78, 81 (S.D.Ohio 1984) ("Even though the results ... may be, to a certain extent, logically inconsistent, Rule 19 does not speak of inconsistent 'results.' Rather, it speaks in terms of inconsistent 'obligations.' "); *Micheel v. Haralson*, 586 F.Supp. 169, 171 (E.D.Pa.1983) ("If only the possibility of diverse holdings as to liability mandates joinder under Rule 19, then the difference between Rule 19 and Rule 20 would be nonexistent."); *see also* 4 Moore's Federal Practice § 19.03[4][d] (3d ed.1999) ("One plaintiff may lose, and yet a later plaintiff may win on precisely the same theory. Although the results are inconsistent, the defendant's obligations are not. Put simply, having to write a check to one claimant and not to another is not the sort of inconsistent obligation the clause addresses....").

This distinction is consistent with the firmly established rule that joint tortfeasors are not necessary parties, even though a failure to join joint tortfeasors could result in logically inconsistent results. *See Temple v. Synthes Corp.*, 498 U.S. 5, 7, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."); *Bedel v. Thompson,*

Although the Fourth Circuit has not expressly adopted this distinction, Rule 19(a)(2)(ii) has only been applied in this circuit in cases where parallel or subsequent suits could give rise to conflicting determinations of a party's legal obligations. *See, e.g., Owens–Illinois, Inc., v. Meade,* 186 F.3d 435, 441 (4th Cir.1999); *Teamsters Local Union No. 171 v. Keal Driveaway Co.,* 173 F.3d 915, 918–19 (4th Cir.1999). In *Owens–Illinois,* the Fourth Circuit held that all potential claimants covered by a settlement agreement were indispensable parties to a federal action brought to enforce an arbitration clause of the agreement.[6] 186 F.3d at 441. In so concluding, the panel noted that if separate courts construed the parties' obligations under the arbitration clause differently, the parties would be subject to conflicting legal obligations under the same agreement, because "one court might compel arbitration on the basis of the Agreement, while the other found that ... alternative judicial remedies were available to some of the Plaintiffs." *Id.* In *Keal Driveaway,* the Fourth Circuit determined that a local affiliate of a union, disappointed with the result of an arbitration between it, another local, and an employer, needed to join the other local in an action to vacate the arbitration award. 173 F.3d at 918–19. If the nonparty local were not joined, it might bring a separate action to enforce the award, which could result in the employer facing conflicting orders—one vacating the arbitration award, and the other enforcing it.[7] *Id.* Thus, in both *Keal Driveaway* and *Owens–Illinois,* the absence of an indispensable party risked inconsistent determinations of a particular legal obligation, as opposed to the risk of an inconsistent adjudication of a fact.[8] Further, at least one district court in this circuit has also recognized the distinction between inconsistent obligations and inconsistent adjudications. *See RPR & Associates v. O'Brien/Atkins Associates, P.A.,* 921 F.Supp. 1457, 1464 (M.D.N.C. 1995) ("Rule 19(a)(2)(ii) protects against obligations that are inconsistent rather than adjudications that are inconsistent"), *aff'd,* 103 F.3d 120 (4th Cir.1996).[9] That district court

103 F.R.D. 78, 81 ("[A]nytime a plaintiff does not join all possible defendants alleged to be jointly and severally liable, those parties who are joined suffer the risk of an inconsistent judgment result in a subsequent action for contribution or indemnification.").

6. In *Owens–Illinois,* the Fourth Circuit considered parallel state and federal actions construing an arbitration clause in a settlement agreement between Owens–Illinois, an alleged tortfeasor, and dozens of potential claimants. 186 F.3d at 438–39. The state action included some of the potential claimants, while the federal action included all of the claimants with whom the alleged tortfeasor was diverse. *See id.* Significantly, each case included some of the same claimants. *See id.* at 439. The potential "inconsistent judgments" identified by the Fourth Circuit would be a judgment in one case requiring arbitration, and a judgment in another allowing claims to go forward in court without arbitration. *See id.* at 441. Were this to happen, some plaintiffs would have an obligation to arbitrate, while others would not, despite being subject to the same arbitration agreement with Owens–Illinois. *See id.*

7. In *Keal Driveaway,* two local affiliates of the International Brotherhood of Teamsters, Local 964 and Local 171, and an employer had entered into arbitration to settle a dispute with respect to the seniority of employees who transferred from one local to another. 173 F.3d at 916–17. But when Local 964 prevailed, Local 171 sought to vacate the arbitral award through a suit against the employer alone. *Id.* The Fourth Circuit concluded that Local 964 was an indispensable party pursuant to Rule 19(a)(2)(ii), because, in the event Local 964 brought a separate action to enforce the arbitration award, such an action could "subject [the employer] to the double-bind" of conflicting judgments—one vacating the award and the other enforcing it. *Id.* at 918–19. Were that to happen, the employer could not obey one order without disobeying the other.

8. *See also Levitt & Sons, Inc. v. Swirnow,* 58 F.R.D. 524, 529 (D.Md.1973) (holding that property owners were necessary parties to a case challenging the validity of encumbrances on the title of their property, because "[a] decree of this Court upholding the validity of the charges in question would not prevent re-litigation of the question by one not a party hereto").

9. In *RPR Associates,* a prime contractor on a state project sued the architect and consulting engineer for acts and omissions connected with that project. 921 F.Supp. at 1460. The contractor also initiated a separate administrative proceeding against the state, seeking damages for delay and other shortcomings allegedly caused by the state and the architect. *See id.* The architect and engineer sought to dismiss the case in part on the theory that the state was necessary, because if the state were found liable in the administrative proceeding it could seek contribution or indemnity from them in a later suit. *See id.* at 1463.

considered that the defendants might escape liability in the current proceeding, yet be found liable for indemnification of or contribution to a nonparty (in this case, the state of North Carolina), on essentially the same facts in a later suit. *See id.* The district court determined that such judgments, though "inconsistent as a matter of logic," would not be inconsistent obligations: "[t]he mere risk that a defendant who has successfully defended against a party may be found liable to another plaintiff in a subsequent action does not necessitate joinder of all of the parties in one action." *Id.* (citing *Field*, 626 F.2d at 301–02).

Thus, for PCA to be a necessary party, VEPCO must identify the risk of an inconsistent obligation as opposed to an inconsistent adjudication or result. In this regard, VEPCO contends that PCA's bankruptcy trustee is likely to bring a breach of contract action against VEPCO for VEPCO's failure to deliver power pursuant to the VEPCO–PCA Entergy Agreement.[10] Yet, VEPCO would be liable to PCA only if the book-out were held not binding or validly revoked. Conversely, the only way that VEPCO could be liable to Southern in this case is if the book-out were held binding, and not revoked,

and that as a result, Southern's performance obligations remained suspended while VEPCO's payment obligations remained in place. Thus, if these cases are litigated in separate actions, it is possible that one court will decide that the book-out was terminated, or not binding, while the other court might decide that the book-out was binding and not terminated. This potential inconsistency is not an inconsistent obligation within Rule 19(a)(2)(11); it is instead an inconsistent adjudication of a fact.[11] Other than the factual determination of whether the book-out was validly revoked, VEPCO's liability in each case would depend entirely upon the underlying contract. VEPCO points to case law that indicates parties to a contract are often necessary to litigation involving construction of that contract.[12] But those cases are inapposite here, as this case involves different contracts between different parties, each giving rise to distinct "causes of action, with different consequences and different measures of damages."[13] PCA's potential action against VEPCO is a cause of action arising from the contract it established with VEPCO, just as the cause of action Southern has is a breach of contract action on its contract with

---

**10.** In this regard, Southern argues (i) that VEPCO misinterpreted the PCA trustee's intent, and (ii) that even if PCA had a colorable claim against VEPCO, whether any suit is brought at all is a matter of speculation. Thus, according to Southern, VEPCO cannot show a substantial risk that PCA will bring suit. *See Coastal Modular Corp. v. Laminators, Inc.*, 635 F.2d 1102, 1108 (4th Cir.1980) (requiring the defendant to identify a "substantial likelihood" that the putative necessary party would bring a lawsuit). This question need not be reached, however, as the alleged potential inconsistency arising from such a suit would not result in the imposition of inconsistent obligations.

**11.** VEPCO relies on the "whipsaw" doctrine discussed in *Schlumberger*, and claims that the "factual whipsaw" discussed therein is analogous to that which VEPCO would suffer if PCA is not joined. But VEPCO's reliance is misplaced, as that case considered joinder in the context of affording complete relief to an insured-defendant in a declaratory judgment action. *See* Rule 19(a)(1). In *Schlumberger*, an insured was covered by several insurers, two of which brought a declaratory judgment action in federal court to determine their coverage obligations with respect to a particular claim of the insured. *See* 36 F.3d

at 1277–78. On these facts, the Fourth Circuit held that all of the insured's insurers must be included in the suit, because "if all of the insurers are not joined in the same case and ... the matter of when the damage occurred is determined by two different courts, and their determinations differ from one another, [the insured] will receive less than full coverage." *Id.* at 1286–87. In other words, joinder was necessary under Rule 19(a)(1), which mandates joinder of a nonparty if "in the person's absence complete relief cannot be accorded among those already parties." *Id.* at 1287 (noting that analysis rests on Rule 19(a)(1)). But here, PCA's absence will not affect VEPCO and Southern's ability to receive complete relief as to the contracts at issue in this case, which are exclusively between VEPCO and Southern.

**12.** *See, e.g., F & M Distributors, Inc. v. American Hardware Supply Co.*, 129 F.R.D. 494 (W.D.Pa. 1990) (holding that lessor of equipment was necessary party in suit brought by owner of equipment against lessee for breach of lease).

**13.** *In re Torcise*, 116 F.3d 860, 866 (11th Cir. 1997). In this way, this case is also distinguishable from *Owens–Illinois, supra*, which involved a single agreement that bound several parties.

VEPCO.[14] The book-out itself does not establish the respective rights and obligations of the parties; it is simply the factual context out of which the present action and a potential future action arise. In that way, any inconsistency from one court to another as to the effect of the book-out would be the classic example of an inconsistent adjudication.[15] Furthermore, because the claims are based on different contracts, a decision in this case that the book-out was valid and not revoked would not necessarily be logically inconsistent with a contrary determination in a case involving the VEPCO–PCA Entergy Agreement.[16] For these reasons, the inconsistency identified by VEPCO would be, at best, an inconsistent adjudication, and thus does not fall within the ambit of Rule 19(a)(2)(ii).

██ Because PCA is not a necessary party, it cannot be an indispensable party. *See Schlumberger,* 36 F.3d at 1285–86 ("Only necessary persons can be indispensable, but not all necessary persons are indispensable."). Thus, the analysis under Rule 19(b) begins and ends with a determination that PCA is not a necessary party. And, in any event, even assuming, *arguendo,* that PCA was a necessary party, VEPCO cannot meet the strict requirements of Rule 19(b) for indispensability.

 A necessary party that cannot be joined can be declared indispensable only after applying the four factor test articulated by Rule 19(b), a test which must be applied strictly, as "[c]ourts are loath to dismiss cases based on nonjoinder of a party." *Owens–Illinois,* 186 F.3d at 441. The first factor of the test is whether a judgment rendered in PCA's absence will be prejudicial to PCA or to the parties. *See* Rule 19(b). In that regard, VEPCO claims that it will be prejudiced by PCA's absence, because any judgment here will not bind PCA. *See Blonder–Tongue Lab. Inc. v. University of Ill. Found.,* 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Yet, VEPCO faces no actual prejudice, as PCA and Southern have different claims against VEPCO, with different measures of damages. Thus, VEPCO only risks facing a subsequent suit involving similar facts, but a different cause of action— a risk that is present in all complex transactions. VEPCO also argues that any issues litigated in this case might subject it to collateral estoppel in a later case with PCA. But VEPCO has an incentive to litigate these issues here, and the fact that VEPCO may lose, and therefore may be subject to collateral estoppel, is not unfairly prejudicial, but simply a consequence of the application of settled res judicata rules.

The second factor of the Rule 19(b) test is whether relief or the judgment can be structured in a way that avoids any potential prejudice. Because no prejudice flows from PCA's absence, this factor is irrelevant.

The third factor is whether any judgment issued in PCA's absence would be adequate. *See* Rule 19(b). VEPCO claims that a judgment here would be inadequate, because it would not take into account the deals between PCA and VEPCO and PCA and Southern. While true, this is irrelevant; Southern is only seeking relief relating to its contract with VEPCO. The fact that the book-out implicates all three companies is not relevant, as the agreement in question only concerns Southern and VEPCO.

██ And the fourth factor is whether Southern will have an adequate remedy if this claim is dismissed. *See* Rule 19(b). VEPCO argues that Southern could bring its

---

14. Because each claim is based on a separate underlying agreement, in addition to distinct damages, each claim could give rise to different affirmative defenses and even be governed by a different state's law.

15. *See Delgado,* 139 F.3d at 3 ("Inconsistent adjudications or results ... occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum.").

16. The "book-out" is, at its essence, an agreement to waive the delivery obligation of each underlying contract. There is, therefore, a book-out only to the extent that each delivery obligation was validly waived, and the book-out is undone only when that waiver is validly revoked. But these facts should be determined for each agreement independent of the other, because the waiver of Southern's delivery obligation to VEPCO is a separate and distinct contractual event from the waiver of VEPCO's delivery obligation to PCA.

claim against VEPCO in the PCA bankruptcy court proceeding, as that court has jurisdiction over all civil proceedings "related to" the administration of a case under Title 11. *See* 28 U.S.C. § 157(c). A civil proceeding is "related to" a bankruptcy proceeding when "the outcome of that [civil] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).[17] Even given this broad definition of "related to," Southern's claim against VEPCO could not be brought in the PCA bankruptcy proceeding: "the mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of [the proceeding]."[18] *Id.* In fact, the outcome of this case will have no effect on PCA's estate, as any judgment here will not create, destroy, or modify any of PCA's rights, obligations, liabilities, or assets.[19] Plaintiff therefore would have no forum to bring its complaint if defendant were to prevail on this motion. For these reasons, even if PCA were a necessary party, it would not be "indispensable" under Rule 19(b).

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record. An appropriate order issued on October 29, 1999.

---

**17.** The Second Circuit, the jurisdiction of the PCA bankruptcy proceeding, seems to have approved of the *Pacor* test. *See In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir. 1992).

**18.** Significantly, in *Pacor* the court held that the bankruptcy proceedings of one party could not include a lawsuit between two other parties, when, as in this case, "there would be no automatic creation of liability against the [bankrupt party] on account of a judgment against [the defendant]." 743 F.2d at 995.

**19.** *See Pacor*, 743 F.2d at 995 ("Even if the Higgins–Pacor dispute is resolved in favor of Higgins, Manville [the party in bankruptcy] would still be able to relitigate any issue, or adopt any position, in response to a subsequent claim by Pacor.").